UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEWART ABRAMSON, individually and on behalf of a class of all persons and entities similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>THE ADVISORY GROUP, LLC d/b/a TAX ADVISORY GROUP d/b/a TAX LAW ADVOCATES d/b/a TAX LAW ADVISORY and JEFF KHATIB,<br><br>        Defendants. | Case No.<br><br>COMPLAINT-CLASS ACTION |

### CLASS ACTION COMPLAINT

#### Preliminary Statement

1. Plaintiff Stewart Abramson ("Plaintiff") brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices, *Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 372 (2012), and the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, which likewise regulates telemarketing, *id.* § 1770(a)(22).

2. Unfortunately, since the TCPA was enacted in 1991, the problem has only gotten worse. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

3. The TCPA is designed to protect consumer privacy by prohibiting—among other tactics—prerecorded or autodialed telemarketing calls to cellular telephones. Such calls are permitted only if the caller has the "prior express written consent" of the called party.

4. Plaintiff alleges that Defendants The Advisory Group, LLC ("TAG") d/b/a Tax Advisory Group d/b/a Tax Law Advocates d/b/a/ Tax Law Advisory and Jeff Khatib (collectively, "Defendants") sent Plaintiff a prerecorded telemarketing call without his prior express written consent, in violation of the TCPA.

5. TAG has been sued under the TCPA several times before for violations of the TCPA.

6. The call to Plaintiff was transmitted using technology that is capable of generating thousands of similar calls per day. Accordingly, Plaintiff brings this action on behalf of a proposed nationwide class of those who received prerecorded telemarketing calls from Defendants, as defined in further detail below.

7. Despite <u>having been found liable to Plaintiff himself</u> under the TCPA in prior litigation, Defendant is still robocalling him in violation of the TCPA. Enough is enough.

8. A class action is the best means of obtaining redress for Defendants' illegal telemarketing and is consistent with both the private right of action afforded by the TCPA and the fairness and efficiency goals of Federal Rule of Civil Procedure ("Rule") 23.

## Parties

9. Plaintiff is a resident of Pennsylvania.

10. Plaintiff is a resident of this District.

11. TAG does business as Tax Advisory Group.

12. TAG does business as Tax Law Advocates.

13. TAG does business as Tax Law Advisory.

14. TAG is a limited liability company.

15. TAG is organized under the laws of Wyoming, and it is also registered in the State of California.

16. TAG conducts business, including automated telemarketing to Plaintiff and other members of the public, throughout Pennsylvania and this District.

17. TAG's principal place of business is 6725 Mesa Ridge Road, Suite 210, San Diego, California 92121.

18. TAG may receive actual notice by mail or courier to, or personal service at, 6725 Mesa Ridge Road, Suite 210, San Diego, California 92121.

19. Jeff Khatib is a natural person employed by TAG involved in the telemarketing at issue in this case.

## Jurisdiction & Venue

20. The telemarketing at issue in Plaintiff's individual claims was deliberately targeted to him while he was in Pennsylvania, in this District, at a phone number bearing a Pennsylvania area code.

21. Defendants regularly engage in business in this District, including sending telemarketing calls and selling tax-preparation services to Pennsylvanians.

22. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims*, 565 U.S. at 372.

23. This Court has supplemental jurisdiction over Plaintiffs' CLRA claim pursuant to 28 U.S.C. § 1367 because the CLRA violation is so related to the TCPA violation—arising from

the same unsolicited, prerecorded telemarketing call—as to form part of the same case or controversy.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to Plaintiff's claims—namely, the receipt of the illegal telemarketing—occurred in this District.

### The Telephone Consumer Protection Act

25. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.

26. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A).

27. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." *Id.* § 227(b)(1)(B).

28. Calls made by an automatic telephone dialing system ("ATDS") or with an artificial or prerecorded voice are referred to as "robocalls" by the Federal Communications Commission ("FCC") and herein.

29. In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the

home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

30. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

31. The FCC has repeatedly made clear that "prior express written consent" is required before making telemarketing robocalls. Specifically, it ordered that a

> consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted).

32. Encouraging people to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

### The Worsening Problem of Telemarketing Robocalls

33. Unfortunately, the problems Congress identified when it enacted the TCPA have grown worse in recent years.

5

34. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

35. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

36. In 2017, the FTC received 4,501,967 complaints about robocalls, up from 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc.

37. Most leading newspapers have been writing and reporting on the exploding number of robocall complaints filed by consumers and widespread consumer outrage about illegal telemarketing. *E.g.*, Gail Collins, *Let's Destroy Robocalls*, N.Y. Times. (Mar. 1, 2019), https://www.nytimes.com/2019/03/01/opinion/robocall-scams.html; Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

38. An Emmy-winning journalist recently observed: "Everybody is annoyed by robocalls. Hatred of them might be the only thing that everyone in America agrees on now." *Robocalls*, Last Week Tonight with John Oliver (HBO Mar. 10, 2019), *available at* https://www.youtube.com/watch?v=FO0iG_P0P6M.

39. The harm from of illegal robocalls is "is at least $3 billion per year from lost time alone." Babette Boliek & Eric Burger, *Beating Back Unwanted Robocalls*, FCC (June 5, 2019), https://www.fcc.gov/news-events/blog/2019/06/05/beating-back-unwanted-robocalls (statement of FCC Chief Economist and FCC Chief Technology Officer).

40. In fact, the harm is much greater than the time lost outright, because "little surges of the stress hormone cortisol" from interruptions from smartphones result in elevated heart rates, sweaty hands, tightened muscles, anxiety and distraction, a "switch cost" that weighs on a person even after the interruption ends, reducing his or her efficiency by approximately 40%. Stephanie Stahl, *Constant Interruptions From Smartphone Can Impact Brain Chemistry, Scientists Say*, CBS Philly (May 29, 2018), https://philadelphia.cbslocal.com/2018/05/29/scientists-constant-interruptions-smartphone-impact-brain-chemistry/.

41. Robocalls are overwhelming hospitals and patients, threatening a new kind of health crisis. Tony Romm, *Robocalls Are Overwhelming Hospitals and Patients, Threatening a New Kind of Health Crisis*, Wash. Post (June 17, 2019), https://www.washingtonpost.com/technology/2019/06/17/robocalls-are-overwhelming-hospitals-patients-threatening-new-kind-health-crisis/.

**Factual Allegations**

42. Defendants sell tax-preparation services to consumers.

7

43. Defendants use telemarketing to promote their products and obtain new customers.

44. Defendants use prerecorded or artificial voices in their telemarketing. No live person with the calling party speaks before the prerecorded message is played.

45. Defendants use equipment that can store numbers to be dialed in an order specified by Defendants.

46. Defendants use equipment that can generate numbers to be dialed.

47. Defendants send telemarketing calls without manual intervention.

48. Defendants' equipment allows for thousands of automated calls to be placed in a single day. On most of these calls, no live human with Defendants ever speaks. Only after the called party responds does TAG's sales representative come on the line. That is, Defendants use robocalls in part to shift the burden of wasted time from themselves onto consumers.

49. TAG has been sued time and again under the TCPA. Compl. at 13, 17, *Donaca v. The Advisory Grp. LLC*, Case No. 3:16-cv-02825-BGS (S.D. Cal. Nov. 17, 2016), ECF No. 1; Compl., *Meyer v. Tax Law Advocates*, Case No. 8:16-cv-00086-JLS-DFM (C.D. Cal. Jan. 20, 2016), ECF No. 1.

50. Indeed, TAG has been found liable under the TCPA before. For instance, it was found liable under the TCPA to Plaintiff himself in *Abramson v. The Advisory Group, LLC*, Case No. AR-17-001897 (C.P. Allegheny Cnty. Pa. filed Apr. 17, 2017).

51. Plaintiff has a cellular telephone number (412) 362-XXXX. All calls to him referenced herein were to that number.

52. Plaintiff never provided prior express written consent to Defendants to call him using artificial or prerecorded voices or an ATDS.

53.     Plaintiff never had an existing business relationship with Defendants.

54.     On October 30, 2019, Plaintiff received a prerecorded telemarketing call out of the blue.  He had not requested the call.  The purpose of the call was not to collect a debt owed by Plaintiff.

55.     The caller ID was (888) 709-4091.

56.     The call began with a prerecorded message in a male voice.  The message was more or less this:

> If you owe more than $10,000 in tax debt, we have good news for you.  If you don't, please press the '2' key now and you will be removed from our system.  But if you do, please listen as our records indicate that you qualify for a huge reduction through the new "Fresh Start" program.  Press the '1' key to be connected to a live agent right now.

57.     The prerecorded message was in no way customized to Plaintiff.

58.     The company Nomorobo has reported that (888) 709-4091 is associated with the same prerecorded message robocall that Plaintiff received.  Nomorobo, *(888) 709-4091 is a Robocaller* (last visited Nov. 21, 2019), https://www.nomorobo.com/lookup/888-709-4091 (press play).

59.     Plaintiff pressed "1" in response to the prerecorded message so that he could determine who had called him.  A prerecorded message in a female voice played.  The message was more or less this: "All of our tax advisors are currently busy helping fellow taxpayers like yourself.  Leave us a message with a callback time, and one of our friendly tax advisors will call you."

60.     On October 31, 2019, Plaintiff called (888) 709-4091 thrice.  Each time, a prerecorded message played.  The message was more or less this: "All of our tax advisors are

currently busy helping fellow taxpayers like yourself. Leave us a message with a callback time, and one of our friendly tax advisors will call you."

61. On November 1, 2019, Plaintiff called (888) 709-4091. A live person answered. He said that his name was Jeff Khatib and spelled his last name. He said that Plaintiff had reached the "Tax Advisory Group". He said that it was located in Mira Mesa, San Diego, California. Plaintiff provided an e-mail address to Jeff Khatib.

62. Later on November 1, 2019, Jeff Khatib called Plaintiff. The caller ID was (619) 202-7686.

63. The company Nomorobo has reported that (619) 202-7686 is associated with robocalls. Nomorobo, *(619) 202-7686 is a Robocaller* (last visited Nov. 21, 2019), nomorobo.com/lookup/619-202-7686 (press play).

64. Later on November 1, 2019, Plaintiff called (619) 202-7686. The call was answered by a prerecorded message, which stated: "Thank you for calling Tax Advisory Group." Plaintiff pressed a button to speak with a live person. A prerecorded message in a female voice played. The message was more or less this: "All of our tax advisors are currently busy helping fellow taxpayers like yourself. Leave us a message with a callback time, and one of our friendly tax advisors will call you."

65. Later on November 1, 2019, Plaintiff called (888) 709-4091. Plaintiff spoke with Jeff Khatib. Plaintiff told Jeff Khatib that Plaintiff had not received an email from Jeff Khatib. Shortly thereafter, Plaintiff received an email from Jeff Khatib. The email contained a hyperlink to a Better Business Bureau profile, which, in turn, hyperlinked to www.taxlawadvisory.com. The email contained the following contact information in the signature block: the email address jeffk@taxadvisorygroup.us and the phone number (888) 980-8341 x 102.

66. On November 8, 2019, Jeff Khatib emailed Plaintiff: "Sorry it took me a while to get back to you, below is the website for the company they use to generate robocalls. Predictive Dialer | Auto Dialer Application | Five9." In the foregoing sentence, "they" referred to TAG. The email hyperlinked to Five9's website.

67. Predictive dialers are ATDSs.

68. Five9's dialers are ATDSs.

69. Plaintiff and his fellow class members were harmed by Defendants' calls. They were temporarily deprived of the legitimate use of their phones because the phone lines were tied up with spam. Their privacy was invaded. They were distracted, frustrated, and annoyed.

## Class Action Statement Pursuant to Local Civil Rule 23

70. As authorized by Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure and Rule 23(A) of the Local Civil Rules of Court of the Western District of Pennsylvania, Plaintiff brings this action on behalf of all other persons and entities similarly situated throughout the United States.

71. The class of persons Plaintiff proposes to represent is: all persons within the United States to whom: (a) Defendants, any of them, and/or a third party acting on any of their behalf, made one or more non-emergency telephone calls; (b) to their residential or cellular telephone numbers; (c) using an artificial or prerecorded voice; (d) at any time in the period that begins 4 years before the filing of the original complaint in this action and ends on the first day of trial.

72. Notwithstanding anything herein to the contrary, excluded from the class are Defendants, any entity in which Defendants (or any of them) have a controlling interest or that has a controlling interest in Defendants (or any of them), Defendants' legal representatives,

11

assignees, and successors, the judges to whom this case is assigned, and the employees and immediate family members of all of the foregoing.

73. The proposed class members are identifiable through phone records and phone number databases, which are in the possession, custody, or control of Defendants or their agents. However, according to a report by the Department of Justice, some telecommunications companies retain calling records for only 3 months. Accordingly, time is of the essence in ensuring that this critical ESI is preserved.

74. The automated technology used to contact Plaintiff is capable of calling hundreds of thousands of people per day. Class members number in the thousands, at least. Individual joinder of these persons is impracticable.

75. Plaintiff is a member of the class.

76. Outcome-determinative questions of fact or law have the same answers for all class members. These questions include but are not limited to the following:

    a. Was the class member in the United States when she, he, or it received the call(s) at issue? (Yes.)

    b. Did Defendants call the class member on a date such that the class member's TCPA claim was not time-barred on the date that the original complaint in this action was filed? (Yes.)

    c. Did Defendants call the class member on her, his, or its residential or cellular telephone number? (Yes.)

    d. Did Defendants use an artificial or prerecorded voice when calling the class member? (Yes.)

    e. Was the purpose of the call telemarketing? (Yes.)

    f.    Was the call necessitated by an emergency?  (No.)

    g.    Had the class member provided prior express written consent before being called?  (No.)

    h.    What is the minimum statutory damages per violation the class member is entitled to?  ($500.)

    i.    Was Defendants' violation of the class member's rights under the TCPA knowing or willful?  (Yes.)

    j.    How much statutory damages per violation should the Court award the class member?  ($1,500.)

    k.    Should Defendants be enjoined?  (Yes.)

    l.    Were the calls to the class member (i) to a business associate, customer, or other person having an established relationship with the person or organization making the call, (ii) for the purpose of collecting an existing obligation, and/or (iii) generated at the request of the recipient? (No.)

77.    Plaintiff's claims are based on the same facts and legal theories as the claims of all class members and therefore are typical of the claims of his fellow class members.  Plaintiff and his fellow class members all received Defendants' telephone calls through the same or a similar dialing system, heard the same or a similar artificial or prerecorded voice, for the same or a similar telemarketing purposes, on their residential or cellular telephones despite not having provided prior express written consent to such robocalls.

78.    Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the class.  Plaintiff is familiar with the TCPA.  Despite its illegal efforts to hide its identity in violation of the Telemarketing Sales Rule, Plaintiff successfully

obtained documentary evidence that the party calling him was TAG.  That's a key milestone in TCPA litigation, and the challenge of successfully conducting such an investigation helps explain why only 1 in 7,000,000 robocalls results in a federal TCPA lawsuit.  *Compare* Herb Weisbaum, *It's Not Just You—Americans Received 30 Billion Robocalls Last Year*, NBC News (Jan. 17, 2018), https://www.nbcnews.com/business/consumer/it-s-not-just-you-americans-received-30-billion-robocalls-n838406 (30.5 billion robocalls); *with* WebRecon, *WebRecon Stats for Dec 2017 & Year in Review* (last visited Oct. 29, 2018), https://webrecon.com/webrecon-stats-for-dec-2017-year-in-review/ (4,392 TCPA complaints).  Plaintiff has prevailed in TCPA litigation against Defendant before.  Plaintiff will fairly and adequately protect the interests of the class.

79. The proposed class counsel have adequate financial resources and extensive track records successfully litigating TCPA class actions.  One of them served as co-counsel to a TCPA class representative whose case resulted in a jury verdict in favor of the class, trebled by the court to $1,200 per call, $3,000 per class member — $61 million in total.  *Krakauer v. Dish Network, L.L.C.*, No. 1:14-CV-333, 2018 U.S. Dist. LEXIS 203725, at *3, 9-10 (M.D.N.C. Dec. 3, 2018), *aff'd*, 925 F.3d 643 (4th Cir. 2019).  The court found:

> Regardless of the underlying subject matter, it takes skilled counsel to successfully manage an 18,000-plus member class action. It takes a different set of highly developed skills to successfully achieve a jury verdict. Class Counsel here is particularly experienced and skilled in TCPA litigation, having settled numerous TCPA class actions including acting as co-lead counsel in a multidistrict TCPA case. Class Counsel also successfully litigated complicated questions involving standing, class certification, agency, and res judicata in this matter.

*Id.* at *9 (citations omitted).

80. Defendants actions are generally applicable to the class and Plaintiff.

81. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. Class members may be ascertained from records maintained by Defendant and/or their agents.

82. The likelihood that individual class members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case and given the small recoveries available through individual actions.

83. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

## Legal Claims

### Count One:
### Violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)

84. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

85. The foregoing acts and omissions of Defendants and/or their affiliates or agents and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to the residential and cellular telephone numbers of Plaintiff and members of the class using an artificial or prerecorded voice.

86. Plaintiff and members of the class are entitled to an award of $500 in damages per violation. 47 U.S.C. § 227(b)(3)(B).

87. Plaintiff and members of the class are entitled to an award of $1,500 in damages per knowing or willful violation. 47 U.S.C. § 227(b)(3) (hanging paragraph).

88. Plaintiff and members of the class are entitled to an injunction prohibiting Defendants and all other persons who are in active concert or participation with them from violating the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to any residential or cellular telephone numbers using an artificial or prerecorded voice.

89. The public interest, including the interest of citizens of Pennsylvania and California, will be served by the injunction. As shown above, people hate unsolicited telemarketing robocalls. For similar reasons, and because it can hardly be said to be a hardship to comply with a bright-line federal statute, the balance of hardships tips in favor of Plaintiff and the putative class, and against Defendants. Plaintiff and putative class members lack an adequate remedy at law and will be irreparably injured in the absence of an injunction, because Defendants will continue committing so many TCPA violations that they will incur liability in excess of their ability to pay. Defendants' net worth is less than $100 million. Since 2016 if not before, consumers have been suing TAG under the TCPA, but it keeps robocalling, in violation of the TCPA.

90. Such an injunction will enforce an important right affecting the public interest, as the legislative history of the TCPA, and the more recent agency and journalist commentary shows. The cessation of Defendants' maddening robocalls will confer a significant mental-health benefit on a large class of persons in Pennsylvania and California. Public enforcement, if any, has not stopped Defendants' illegal robocalling. Accordingly, private enforcement, through the private right of action in the TCPA, is needed. The financial burden should not in the interest of justice be paid out of Plaintiff's recovery because the burden of prosecuting a complex class action such as this one through trial is hundreds of thousands of dollars in out-of-pocket costs

and millions of dollars in attorneys' fees, dwarfing the monetary value of Plaintiff's individual claims.

91. Plaintiff further seeks all of the relief set forth below.

## Count Two:
## Violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(22)

92. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

93. The calls at issue in this case weren't disseminated to a business associate, customer, or other person having an established relationship with the person or organization making the call.

94. The calls at issue in this case weren't for the purpose of collecting an existing obligation.

95. The calls at issue in this case weren't generated at the request of the recipient.

96. The telemarketing campaign at issue in this case was conceived, planned, directed, organized, authorized, overseen, and ratified in California by Defendants and TAG's officers and members, who benefitted from such conduct in California.

97. The foregoing acts and omissions of Defendants and/or their affiliates or agents and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the CLRA, Cal. Civ. Code §§ 1750 *et seq.*, by disseminating an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message.

98. Plaintiff and members of the class are entitled to their reasonable attorneys fees and an injunction prohibiting Defendants and all other persons who are in active concert or participation with them from violating the CLRA, *id.* §§ 1750 *et seq.*, by disseminating an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message. *Id.* § 1780(a), (e).

99. The public interest, including the interest of citizens of Pennsylvania and California, will be served by the injunction. As shown above, people hate unsolicited telemarketing robocalls. For similar reasons, and because it can hardly be said to be a hardship to comply with a bright-line statute of the state of one's principal place of business, the balance of hardships tips in favor of Plaintiff and the putative class, and against Defendants. Plaintiff and putative class members lack an adequate remedy at law and will be irreparably injured in the absence of an injunction, because Defendants will continue committing so many CLRA violations that they will incur liability in excess of their ability to pay. Defendants' net worth is less than $100 million. Since 2016 if not before, consumers have been suing TAG for illegal robocalling.

100. Such an injunction will enforce an important right affecting the public interest. The cessation of Defendants' maddening robocalls will confer a significant mental-health benefit on a large class of persons in Pennsylvania and California. Public enforcement, if any, has not stopped Defendants' illegal robocalling. Accordingly, private enforcement, through the private right of action in the CLRA, is needed. The financial burden should not in the interest of justice be paid out of Plaintiff's recovery because the burden of prosecuting a complex class action such

as this one through trial is hundreds of thousands of dollars in out-of-pocket costs and millions of dollars in attorneys' fees, dwarfing the monetary value of Plaintiff's individual claims.

101. Plaintiff further seeks all of the relief set forth below.

### Relief Sought

For himself and all class members, Plaintiff requests the following relief:

A. Certification of the proposed class;

B. Appointment of Plaintiff as representative of the class;

C. Appointment of the undersigned counsel as counsel for the class;

D. A declaration that Defendants violated the TCPA and CLRA;

E. An order enjoining Defendants and all other persons who are in active concert or participation with them from engaging in the unlawful conduct set forth herein;

F. An award to Plaintiff and the class of damages, as allowed by law;

G. An award to Plaintiff and the class of punitive damages, as allowed by the CLRA;

H. An award to Plaintiff and the class of attorney's fees, as allowed by California Civil Code sections 1021.5 and 1780(e), or any other source of applicable law;

I. Leave to amend this Complaint to conform to the evidence presented at trial; and

J. Orders granting such other and further relief as the Court deems necessary, just, and proper.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

Plaintiff,
By Counsel,

By: _/s/ Clayton S. Morrow_____
   Clayton S. Morrow
   csm@consumerlaw365.com
   Morrow & Artim, PC
   304 Ross Street, 7th Floor
   Pittsburgh, PA 15219
   Telephone: (412) 281-1250

   Anthony I. Paronich
   anthony@paronichlaw.com
   Paronich Law, P.C.
   350 Lincoln Street, Suite 2400
   Hingham, MA 02043
   Telephone: (508) 221-1510
   *Subject to Pro Hac Vice*